May it please the court, Denise Fjordbeck on behalf of the Oregon Department of Motor Vehicles, the appellant in this case. The question before the court in this case is whether the district court erred in allowing the case to go to the jury. Our position is that the plaintiff failed to present proof that similarly situated employees, in this case employees who had engaged in the same or similar misconduct, or against whom similar kinds of allegations were pending and being investigated, were treated differently than he was. It's our position that he did not do that. Now, to be sure, there was a great deal of evidence below that other people had performed transactions for friends and family members and had either not been disciplined or the discipline had been in the form of a reprimand or a letter of counseling or something of that nature. The difficulty with his proof or his argument on that point is that that was not the only behavior for which Mr. Arevalo was being investigated and then later demoted. There are essentially five points that Mr. Arevalo complains that he was treated differently. The first chronologically, I guess, was being placed on administrative leave. At the time that he was placed on administrative leave, the state police had declined to take the case to the district attorney's office for possible criminal prosecution because there was no evidence that Mr. Arevalo was accepting money. But there was evidence that Mr. Arevalo was giving preferential treatment to certain customers at DMV. There was also evidence which he could have lost, but we're dealing with the standard for judgment as a matter of law. I understand that. Well, it was his burden to prove. You're doing de novo review. Obviously, we have to give Mr. Arevalo the benefit of all inferences that we can make. But he also had the burden of proving that there were similarly situated people who were treated better than he was. And he did not do that. But did your attorney have not concluded that there were at least two people in his same office, both women and he was a man, who did similar things and were not similarly treated? No, they could not because the conduct that they engaged in was not similar. The conduct that ultimately Mr. Arevalo was demoted for was not simply performing transactions, that he wasn't supposed to be performing. What he had done, in essence, was working as a supervisor, had turned the office into a hospital workplace. And there was never really any dispute about the facts about what that office was like when Mr. Arevalo was the lead worker. Virtually everyone in the office testified what the atmosphere was like. And Mr. Arevalo didn't deny that that had occurred. And so his burden was to show that there were people that were similarly situated, i.e., Was part of the reason for either the proposed dismissal that never occurred or the demotion the sexual behavior? My understanding is that it was not one of the reasons for the proposed dismissal. Was it one of the reasons for the demotion? Well, that's somewhat complicated. And your confusion is very appropriate. At the time, when Ms. Martinez talked to the police, she told them that she had been having an affair with Mr. Arevalo. Mr. Arevalo denied it. When Ms. Martinez was then interviewed as part of the union process, she told them that it wasn't true. So she kind of flopped back and forth on that. And so in the letter of proposed discipline, I think both the dismissal and the termination, the agency relied on the turmoil in the office but didn't expressly rely on the sexual conduct. The short answer is no. No. Except that later on, there was another proposed disciplinary action based on that. And essentially what the agency said was that they would not impose any additional discipline. So for purposes of our view, there was nothing that happened that depended on that? Right. Okay. Yeah, we were looking at the atmosphere in the office rather than the sexual activity itself. Because that's what the- Wasn't this something the jury could evaluate from the conflict in the evidence? There was no conflict in the evidence as far as the situation in the office. As to why he was fired? As to why he was demoted? My understanding of the standard of review is certainly we have to read any inferences in his favor. But to the extent that there is undisputed evidence that's not favorable to him- Did Mr. Aragallo testify? Yes, he did. Did he say that there wasn't a bad atmosphere? Did he refute any of the incidents that were supposed to be supporting the bad atmosphere? My memory is that he did not. He admitted, for example, that he and Ms. Cortez had had a confrontation in their supervisor's office. I think his description of it was not as colorful as hers were. But he didn't deny it. I've heard testimony from employees like Ms. Jensen, for example, who said that the atmosphere was so bad that she was taking her breaks and her lunch out in her car. But he wasn't running that office. He was running the office. He was the lead worker. Wasn't there a supervisor over him? There was a supervisor over him. But the description of the way the office was run was that all of the day-to-day supervision of the employees was done by Mr. Aragallo. His supervisor was working, it almost sounds like more with statistical things, how quickly are the customers being served? They have wait times. They have standards for that. And so she was generally overseeing the office. But the day-to-day supervision of the workers in the office was done by Mr. Aragallo. And I guess that comes to the final point that I wanted to make. What is an employer supposed to do in this kind of situation? If they've got someone that's created tremendous turmoil, obviously sending him back to that office is not an option in terms of good employment decisions. And putting him in a position, again, where he has authority over other people is not an option. And we would submit that the employer really did the only reasonable thing. Unless the Court has other questions, I'd like to reserve my one minute. Okay. Thank you. Good morning. May it please the Court, my name is Kevin Lafke representing Mr. Aragallo. We have a little bit of a disagreement over the standard of review. I think the Court reviews the verdict and the facts that supported the verdict for substantial evidence. I don't think that by filing a motion for judgment notwithstanding the verdict, based not on any legal failure but solely based on factual failure, that somehow the State can turn this into a de novo review in front of this Court. So I think it's whether there's substantial evidence to support the verdict. Of course, you look at the facts and the like most favorable to Mr. Aragallo because the verdict was in his favor. The State seems to focus on the issue of whether there were similarly situated people treated differently than Mr. Aragallo. Of course, that's the fourth prong in the McDonnell-Douglas test. There really seems to be no dispute on the first three prongs, so I'll focus on that. There were two individuals in the same office, as you pointed out, Judge, that were treated differently than Mr. Aragallo. One was Margarita Maggie Robles, Hispanic female, who was Mr. Aragallo's direct supervisor, had an office right there in this office, and was ultimately responsible for everything that went on in this office. The other was Anna Cravoy, Caucasian female, Russian national origin, and probably one of the most interesting parts of the record, and I think this appears at the excerpt, page 351 of the excerpt or record, where Billy Brown, the supervisor that is making some of the employment decisions and the adverse employment decisions towards Mr. Aragallo, is taking notes of interviews with co-workers of Mr. Aragallo. She takes a statement from one of the co-workers, and the co-worker referring to Ms. Cravoy, the Caucasian female, Ms. Brown writes, something appears to be going on here, too. It's not just us sitting here saying, well, these people look like they're similarly situated. The supervisor writes in her notes and her investigation of Mr. Aragallo that something appears to be going on with Anna, too. One very odd thing about this case, however, is you're not challenging the demotion. That's correct. You are challenging the procedure by which they reached the demotion. Is that correct? There were five specifications of adverse employment actions. And there's no issue that's been raised here about whether these were adverse employment actions. No. They're kind of flimsy, but that's not our issue. And it was not raised below that they were not adverse employment actions, and the jury verdict was a simple form. Was he discriminated against? Yes. What is your award in his favor? So the jury was not asked to identify on what protected status they were basing their verdict, Hispanic male, Hispanic male. They were not asked to identify which of the five adverse employment actions they were basing their verdict on. So all you have to do in review here is to look at any of his protected statuses and any of the adverse employment actions. And which protected status would you suggest we look at, by the way? I don't think you need to look at any of them. Well, but perhaps we do. The Hispanic one's a little flimsy because we have ‑‑ I gather that the woman who was in charge of the office was also Hispanic. Is that not right? She was. But then Ms. Cravoy, the woman that I was just describing to you, was not Hispanic. So that's why I think ‑‑ Right. But if we were going to try and ‑‑ if the jury would have a hard time surmising that Hispanics were being treated differently than non-Hispanics with regard to the kinds of supposedly illegal or questionable activities. So that seems likely that is a dip. So, therefore, the male‑female seems a bit more promising. As the appellate lawyer, I answer your question by saying it doesn't matter. As the trial lawyer who sat through four days of trial and then waited for a jury verdict that took several hours of deliberation, I feel that the male‑female distinction was the basis on which the jury made their decision. But that, of course, is the danger on review, trying to decide what a jury did when it's not really a certain area below. Right. So what about the main point that the DMV seems to be making now, which is that the real problem was that the jury could not have come to the verdict it did with regard to ‑‑ Because the basis for the discipline was really not, or at least not primarily these activities, but instead the way he was running the office. If you look at the first adverse employment action, which is placing Mr. Arevalo on administrative leave, it's a letter set forth at ER 375, you will see that the bulk of the allegations in this letter, the document that placed him on administrative leave, relate to whether he was administering his official duties in a fair manner, testing and evaluating applicants in compliance with the rules, modifying test results to enable otherwise failing applicants to obtain a driver's license, respectfully declining offers of money or favors for services rendered, not processing your relatives' or friends' transactions. I've just read to you five out of the six bases, and all of those apply to Ms. Cravois, the Caucasian female, or Ms. Robles, the Hispanic female. There's only one here that DMV now focuses on, and that's working in harmony with your fellow team members. So as you can see, there were five bases set forth. Mr. Arevalo being placed on administrative leave, one of the adverse employment actions that was submitted to the jury, and you'll see when you review ER 351, 358, 59, and 372, the records of the notes that were taken in this investigation, that remarkably similar allegations were made against both Ms. Robles and Ms. Cravois. In fact, Ms. Brown testified during the trial. And there is, in the longer version, the suspension letter, there is a discussion of intimidating coworkers. There is. And again, there were five adverse employment actions. Administrative leave was one of them. Being issued the pre-dismissal letter was another. Being issued the pre-demotion letter was yet another. So without the jury specifying as to which adverse employment action or all of them that they relied upon, it's impossible for us. Was that evidence contravened? In other words, did Mr. Arevalo testify otherwise with regard to the intimidation allegations? Yes, he did testify about that. I tried to look briefly when you were asking the question in the portion of his testimony that's set forth in the supplemental excerpt of record. I couldn't find it in that. It's just a partial of his transcript testimony. My recollection, not being reviewed on this issue for a year and a half, is that he did respond to those allegations. Again, the exhibits that I referred to earlier showing disparate treatment of other individuals similarly situated were admitted pre-trial. And I just wanted to sum up with a couple of points. First of all, the union president testified for Mr. Arevalo, and he testified that men were subjected to more severe discipline in the region that Ms. Brown administered. She's the person that conducted this investigation, disciplined Mr. Arevalo. He worked in her region. That testimony was essentially unrebutted by DMV. I believe the trial court set forth a fairly good synopsis that we set forth at page 11-12 of the red brief, essentially setting forth, after she had listened to four days of testimony as well, how the jury could, in the light most favorable to Mr. Arevalo, make the verdict that they did make. On the fifth one about expenses, what was produced in regard to that? Mr. Arevalo testified, and if I recall correctly, it was just through his testimony that this was presented, regarding his treatment in Albany after he had been demoted and transferred. And that had to do with the fact that he and a female co-worker attended a community event on behalf of their employer. The female co-worker applied for reimbursement for her expenses surrounding attending that event. Mr. Arevalo similarly applied and was denied. My recollection is that only came in through his testimony, although I believe the defense submitted testimony through, I believe it was Debbie Hansloven, his supervisor in Albany, to attempt to rebut that in some fashion. But there was no dispute that it occurred. Thank you. One of the things that interested me as well when I was first looking at this case was how giving someone due process under the statutes and rules that are applicable to public employees could be an adverse employment action. But as I agreed this court's case law, an adverse employment action can encompass those kind of activities if they're done in a discriminatory manner. The difficulty again here is that the evidence of discrimination just isn't there. With regard to Crowboy, she was Ukrainian, I believe, working with a Russian-speaking population, brand-new employees still on probation, and there was a concern about what she was doing. But again, she wasn't the one that was causing a hostile work environment. The same is true of Robles. I think the bottom line problem is that the jury could have disbelieved that the hostile work environment problems to which she turned were really a motivating factor in any way, since they were one of many things that were said and were said somewhat in passing at times. And if the jury just didn't buy that, you lose. Well, it's difficult for me to see how the jury can not buy something that is undisputed. Well, it may be undisputed that it happened, but it may be disputed that it was the motivation, the actual reason that this all would have happened if nothing else had happened just because of that. Well, I guess my response to that would be that perhaps that is where the same actor inference is appropriate. The same people that have praised and promoted him for many years are the people that are allegedly discriminating against him. And that's the inference the jury could choose to draw, but it chose not to. Well, under this court's case law, it appears that under certain circumstances, it's an inference that has to be drawn. Thank you, Your Honor. Thank you. You don't stress the first part of the trial, which is a different state. Right. Not such a state. Right. Right. I think that there is no, frankly, there's no enthusiasm on behalf of the trial attorney to try this case again. And we do believe that as a matter of law, the case wasn't proven. Thank you.
judges: Goodwin, Hug, Berzon